IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael Logan, et al., | ) | No. CV 02-360-TUC-RCC (HCE) |
| Plaintiffs, | )<br>) | **REPORT & RECOMMENDATION** |
| vs. | )<br>) | |
| State of Arizona, et. al., | )<br>) | |
| Defendants. | )<br>) | |
| | )<br>) | |

Pending before the Court is Defendant Ivan Bartos' Motion for Summary Judgment. For the following reasons, the Magistrate Judge recommends that the District Court grant Defendant Bartos' Motion.

## I.  PROCEDURAL BACKGROUND

Plaintiffs Michael and Nicole Logan, who are husband and wife, filed the instant action through counsel pursuant to 42 U.S.C. § 1983 for violation of Plaintiffs' constitutional rights.  Plaintiffs also alleged state law claims.   Plaintiffs named the following Defendants: (1) the State of Arizona; (2) the Arizona Department of Corrections (hereinafter "ADOC"); (3) Ivan Bartos[1] and Jane Doe Bartos.

---

[1]   At the time of the events giving rise to the instant suit, Defendant Bartos was the Deputy Warden at the Mohave Unit of the Arizona State Prison Complex in Douglas, Arizona.  (Defendant's Statement of Facts, Ex. C)  He is now a Warden at the Arizona State

This matter was initially referred to the Honorable Nancy F. Fiora, United States Magistrate Judge.  On August 21, 2003, Magistrate Judge Fiora recommended that the District Court grant Defendants' Motion to Dismiss (1) the State of Arizona and ADOC because they were not proper defendants; and (2) all state law claims and certain claims filed pursuant to section 1983 as barred by the statute of limitations.  (August 21, 2003 Report and Recommendation)  On September 30, 2003, the District Court adopted Magistrate Judge Fiora's Report and Recommendation in part.  Specifically, the District Court dismissed all claims against the State of Arizona and ADOC; dismissed all state law claims; and denied Defendants' Motion to Dismiss "the section 1983 claims against remaining Defendants." (September 30, 2003 Order, p. 4)

On January 27, 2005, the only remaining Defendant, Ivan Bartos, filed the instant Motion for Summary Judgment.  On July 8, 2005, this matter was referred to the undersigned Magistrate Judge in light of Magistrate Judge Fiora's retirement.

## II.  FACTUAL BACKGROUND

On December 15, 1999, Plaintiff Michael Logan (hereinafter "Mr. Logan") was sentenced to serve a term of imprisonment at the ADOC.  (September 8, 2003 Objection to Report and Recommendation, Ex. B) The sentencing order directed the clerk of court to "remit to the Department of Corrections a copy of this order together with all pre-sentence reports, probation violation reports, medical and psychological reports relating to the defendant and involving this case."  (Id.)  Thereafter, Mr. Logan was incarcerated at the Mohave Unit of the Arizona State Prison Complex in Douglas, Arizona (hereinafter "ASPC-Douglas").  Plaintiffs claim that during Mr. Logan's incarceration at ASPC-Douglas, Defendant Bartos violated Mr. Logan's constitutional rights by failing to place Mr. Logan in protective segregation upon Mr. Logan's arrival; failing to implement or comply with regulations to protect Mr. Logan from assault by prison gang members; ordering, "[a]gainst

---

Prison Complex in Yuma, Arizona.  (Id.)

medical advice," that Plaintiff be transported by van instead of by helicopter to a hospital located over two hours away; failing to provide adequate medical after care upon Plaintiff's return to the prison; and placing Mr. Logan in the Central Detention Unit (hereinafter "CDU") after Mr. Logan was assaulted by other inmates.   (*See generally*, Plaintiffs' Complaint)  The following facts are not disputed.

When Mr. Logan arrived at ASPC-Douglas in January 2000, he learned he was going to be placed in medium-security general population.  (Defendant's Statement of Facts (hereinafter "DSOF") Ex. A, p.11)   At that time, Mr. Logan indicated on the classification score sheet that he disagreed with such placement and  classification because he felt he should be placed in "some form of protective segregation."  (Id. at p. 12)   Despite Mr. Logan's disagreement with his classification, he was placed in medium-security general population.  (Id.)

In approximately March of 2000, Plaintiff was approached by members of a prison gang who solicited his assistance with transferring funds, which involved Mr. Logan arranging for his wife to mail money orders to addresses supplied by the gang members.  (Id. at pp. 17-19)   In return, Plaintiff would receive credit at the prison store in excess of the amount of the money orders.  (Id.)   There is no dispute in the record that such activity was criminal in nature and that the gang was comprised of members of the Aryan Brotherhood. (DSOF, at p.3 & Ex. A, p. 17;  Plaintiffs' Statement of Facts (hereinafter "PSOF") p.1)  This arrangement continued until Mr. Logan and the gang members had a dispute in May or June of 2000.  (Id. at pp. 19-23)

On July 5, 2000, Mr. Logan attended a 180-day classification meeting with officers who are not identified in the record.  (Id. at pp. 13-16) That meeting resulted in the lowering of Mr. Logan's institutional risk score which involves consideration of the following criteria: prior institutional adjustment; community stability; adjustment during initial classification; probation/parole adjustment; mental health; age; security threat group affiliation; and substance abuse history.  (Id.; ADOC website at http://www.adc.state.az.us) During that

meeting, Plaintiff did not "bring up the issue of protective segregation" and on a form Plaintiff indicated his agreement to the re-classification. (Id. at p. 15)

Mr. Logan's dispute with the gang members continued after the date of the classification meeting.  (*See* Id. at p. 16)  On July 20, 2000, a few days after Mr. Logan "started asserting himself" about the fact that he was due a payment, Mr. Logan was attacked in the shower.  (Id. at pp. 22-23) Mr. Logan was not significantly injured during the July 20 attack.  (Id. at p. 23)

Mr. Logan was attacked again on  July 21, 2000.  (Id. at p. 40)   Medical records submitted by Defendant reflect that after the attack, Plaintiff was seen by K. Hudson, C.L.P.N., at the location of the attack.  (Defendant's Supplement Statement of Facts (hereinafter "DSSOF") Ex. A.1, p.22) Nurse Hudson's notes, which begin at 1350 hours, indicate that Mr. Logan could not remember what had happened but could remember his name and the day.  (Id.) Mr. Logan was assessed as having injuries to his face and head including swollen eyes and bloody nose, abrasions under his right nipple and below his left armpit, and an abraded and bruised right elbow.  (Id.)  He complained of head pain, right hand pain and tenderness in his rib area.  (Id.)

Mr. Logan's vital signs were taken and an ambulance and backboard were summoned at approximately 1355 hours.  (Id.)  Mr. Logan moved to the gurney with minimal guidance and was taken to the Mohave Unit Emergency Room where ice packs were applied to his injuries. (Id. at p.21)  Mr. Logan was able to answer questions and follow directions. (Id.) His face was asymmetrical with a higher left eye orbit  and cheek bone. (Id.)  His front tooth was chipped.  Examination by Nurse Hudson revealed no abdominal tenderness or pain.  (Id.) Dr. Prido Poblanco, who is employed by the ADOC as a Physician Supervisor, was telephoned.  (Id.; DSSOF Ex.A)[2]

---

[2]At 1438 hours, Dr. Poblanco called ASPC-Douglas and was advised of Mr. Logan's transport status.  (DSSOF Ex. A.1, p.21)

At approximately 1432 hours, the Southeast Arizona Medical Center (hereinafter "SEAMC") trauma response team arrived at the Mohave Unit to transport Mr. Logan to SEAMC. (DSSOF Ex. A.1, p.21) When Mr. Logan arrived at the SEAMC emergency room he was alert. (Id. at p.31) Upon examination and review of x-rays, the SEAMC emergency room physician's impression was facial contusions, fracture of the left maxillary, and swelling of soft tissue. (Id. at p.33) Radiology reports from SEAMC reflect fractured nasal bones; fracture of the floor of the left orbit and the anterior and lateral wall of the left maxillary antrum; and no spinal injuries. (Id. at p.53) At some point, the SEAMC physician discussed Mr. Logan's condition with a physician at St. Mary's Hospital in Tucson, Arizona. (Id. at p.33)

Mr. Logan was then transferred by ADOC van to St. Mary's Hospital, where he arrived at 2200 hours.[3] (Id. at pp.36-37) His vital signs showed his pulse was normal and breathing was unlabored. (Id. at p.28) The admitting physician's impression was: left maxillary complex fracture, left ethmoid plate fracture with air in the soft tissues on CT scan; suturable laceration, now 10 hours old, above the right eyebrow. (Id. at p.29)

Mr. Logan was discharged from St. Mary's Hospital on July 22, 2000. (Id. at pp.30-40) Prior to discharge, Mr. Logan was examined by Dr. Falk who noted: edema particularly over his left periorbital region; Mr. Logan's complaints of mild headache and tenderness about the left orbit; numbness in Mr. Logan's left cheek; and Mr. Logan's statements that his teeth are in good position and that he does not have any decreased vision or diplopia. (Id. at p.30) Dr. Falk's impression was that "the patient has a left maxillary fracture...but he does not require any open reduction or internal fixation at this time. I told this patient to be aware of future diplopia at which point I will need to see him in follow up." (Id.) Dr. Falk recommended that Mr. Logan receive Tylenol #3 for pain, ice packs, and diet as tolerated. (Id. at pp.40, 44)

---

[3]Mr. Logan was on a gurney in the van. (DSOF, Ex. A, p. 35)

After his return to ASPC-Douglas, Mr. Logan was placed in CDU.   (DSOF, Ex. A, p.58)

## III.  SUMMARY JUDGMENT STANDARD

Pursuant to the Federal Rules of Civil Procedure, a party may seek summary judgment where there is no genuine issue as to any material fact and that party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

The initial burden rests on the moving party to point out the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Although reference is made to the movant's "burden," Rule 56 places no evidentiary burden on the moving party beyond that which is required to prevail at trial.  Therefore, while the adverse party must offer evidence sufficient to raise a genuine issue of fact on an issue for which that party has the burden of proof, the moving party need provide nothing more than a reference to those materials on file in the case that support the movant's belief that there is an absence of any genuine issue of material fact.  *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).  Once satisfied, the burden shifts to the opponent to come forward with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)).  *See also  Celotex,* 477 U.S. at 324 (the opponent must demonstrate through production of probative evidence that an issue of fact remains to be tried.)   Indeed, a party opposing summary judgment may not rest on mere allegations or denials in his pleading. Fed. R. Civ. P. 56(e).  Nor may the opponent rely upon conclusory or speculative testimony to raise a genuine issue of fact to defeat summary judgment.  *Anheuser-Busch, Inc. v. Natural Beverage Distrib.,* 69 F.3d 337, 345 (9th Cir. 1995).

When judging the evidence at the summary judgment stage, a district court is not to make credibility determinations or weigh conflicting evidence, but is required to view all inferences in the light most favorable to the non-moving party. *Musick,* 913 F.2d at 1394. The ultimate question is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986).   The mere existence of a scintilla of evidence supporting the non-movant's position will be insufficient. *Anderson,* 477 U.S. at 252.  There must be evidence from which the jury could reasonably find for the non-movant.  *Id.*   If the factual context makes the non-movant's claim implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary.  *Matsushita,* 475 U.S. 574, 587 (1986).

## IV.  DISCUSSION

Defendant Bartos argues that he is entitled to summary judgment because Plaintiffs are unable to show that he played any role in the alleged constitutional deprivations. Alternatively, Defendant Bartos argues that the alleged conduct does not give rise to a constitutional violation and that he is entitled to qualified immunity

### A.  Plaintiffs' claim that Defendant Bartos failed to protect Mr. Logan from attack

Plaintiffs allege that the state sentencing court included an instruction in its judgment and sentencing order that "ADOC be provided with a copy of Plaintiff Michael Logan's Pre-Sentence Investigation Report and ADOC did receive said report."  (Complaint, p.4) According to Plaintiffs, the Report "contained numerous references to [Mr. Logan's] background in law enforcement, investigations, the legal profession and, most notably, the fact that [Mr. Logan] was very recently a candidate for a judicial post in his community." (Id. at pp. 7-8) Plaintiffs further allege that Defendant Bartos disregarded the contents of the Report and failed "to follow appropriate procedures" and policies by initially placing Mr. Logan in the medium-security general population instead of protective custody; by ignoring

Mr. Logan's specific requests to be placed in protective custody; and by allowing prison gang members "to run amok and prey upon other inmates."  (Id. at pp. 4-5, 8)

Plaintiffs' Response to Defendant Bartos' Motion for Summary Judgment does not specifically address these claims or Defendant Bartos' argument regarding same.

There is no evidence that the Pre-Sentence Investigation Report was not considered or  that under ADOC regulations or policies the content of the Pre-Sentence Investigation Report would have definitively led to a different custody determination.  Although Mr. Logan disagreed with his placement in medium-security general population when he first arrived at ASPC-Douglas in January 2000, there is no evidence on the instant record that Defendant Bartos had any involvement in Mr. Logan's initial placement.  Moreover, by the time of the July 2000 attacks, Plaintiff had attended a re-classification meeting where he agreed to the lowering of his institutional risk score and made no mention about the ongoing activities and dispute with the prison gang.    Plaintiff testified at his deposition that Defendant Bartos "was aware or should have been aware" that Mr. Logan had requested protective custody in January 2000.  (DSOF, Ex. A, p.26)  Even though prior to the July 21, 2000 incident Mr. Logan did have one encounter with Defendant Bartos when Defendant Bartos was involved in serving Mr. Logan with a restraining order in a matter unrelated to the instant action, Mr. Logan did not discuss with Defendant Bartos his activities and problems with the gang.  (DSOF, Ex. A, pp. 26-27) Nor is there evidence in the record that Mr. Logan informed Defendant Bartos about the July 20, 2000 attack.

At his deposition, Mr. Logan agreed there was no direct evidence that Defendant Bartos was aware of Mr. Logan's activities or problems with the gang prior to the July 21, 2000 incident.  (DSOF, Ex. A, p. 27) However, Mr. Logan contends that Defendant Bartos is liable because he:

> ...was the deputy warden of the Mohave Unit.   The buck has to stop somewhere.   Now, I believe that there are numerous people all up and down the chain of command both under and above Mr. Bartos that either should have had some knowledge or could have had some knowledge.  All somebody had to do was read my P[re] S[entence] I[nvestigation]...It is my understanding that

deputy wardens know everything that is happening out in the yard, including those activities that might be illegal, because to some degree, they allow for a lot of it to happen to maintain the peace. Can I say specifically what he did or did not know. No, I can't.

(Id. at pp. 27-28).

It is well-settled that for liability to attach under section 1983, the plaintiff must show that he suffered a specific injury as a result of specific conduct of the defendant. *See Rizzo v. Goode,* 423 U.S. 362, 371-372, 377 (1976); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises only upon a showing of personal participation by the defendant."); *King v. Atiyeh,* 814 F.2d 565, 568 (9th Cir. 1987) (state officials are not subject to suit under section 1983 unless they play an affirmative part in the alleged deprivation of constitutional rights.)  Moreover, "[t]here is no respondeat superior liability under section 1983." *Taylor,* 880 F.2d at 1045.  Instead, a supervisor such as Defendant Bartos can be "liable for constitutional violations of his subordinates if [he]... participated in or directed the violations, or knew of the violations and failed to prevent them." *Id.* Additionally, supervisory liability can exist "even without overt participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cri. 1991) (citations and internal quotations omitted), *abrogated on other grounds by Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

There is no evidence that Defendant Bartos personally participated in or directed others regarding Mr. Logan's placement in medium-security general population. Accordingly,  to the extent that Plaintiffs base Defendant Bartos' culpability on his position as a deputy warden, such claim must fail because there is no respondeat superior liability under section 1983 which requires a showing of personal participation by the defendant. *Taylor,* 880 F.2d at 1045.  *See also Collins v. County of Kern,* 390 F.Supp.2d 964, 974 (E.D. Cal. 2005) (granting summary judgment in favor of defendant prison official where there was

no evidence that defendant had anything to do with plaintiff's placement or knew of the risk to plaintiff and disregarded such risk.)

Further, Mr. Logan's opinion that Defendant Bartos should have general knowledge of illegal activity in the prison yard (*see* DSOF, Ex. A, p. 28) does not mean that Mr. Logan's Eighth Amendment rights were violated. While prison officials have a duty to protect prisoners from violence at the hands of other prisoners, "[i]t is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety."  *Farmer*, 511 U.S. at  834. Instead, the failure of prison officials to protect inmates from attacks by other inmates violates the Eighth Amendment only when: (1) the deprivation alleged is objectively, sufficiently serious; and (2) the prison officials had a sufficiently culpable state of mind, thus, acting with deliberate indifference to inmate health or safety. *Id.*; *Hearns v. Terhune,* 413 F.3d 1036, 1040 (9th Cir. 2005).

To satisfy the first requirement, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer,* 511 U.S. at 835 (citation omitted)  Under the second requirement, "'deliberate indifference' is evidenced only when the official knows of and disregards an excessive risk to inmate health or safety; 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Clement v. Gomez,* 298 F.3d 898 (9th Cir. 2002) (quoting *Farmer,* 511 U.S. at 837).  If the prison official "should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk."  *Toguchi v. Chung,* 391 F.3d 1051, 1057 (9th Cir. 2004) (quotations and citation omitted)   However, a prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault.  The question...is whether the prison officials, acting with deliberate indifference, exposed the

- 10 -

prisoner to a sufficiently substantial risk of serious damage to future health...." *Farmer,* 511 U.S. at 843 (internal quotation marks and citation omitted). *See also Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) ("The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.") Additionally, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 844-845.

As unfortunate as it is that Mr. Logan was assaulted, the law is clear that not every circumstance surrounding injuries received by one inmate at the hands of another inmate rise to the level of a constitutional violation. *Farmer,* 511 U.S. at 834. Mr. Logan's testimony is clear that he never informed Defendant Bartos about his activities and trouble with the gang. Nor is there any evidence on the record suggesting that gang violence at ASPC-Douglas posed a substantial risk of serious injury to inmates incarcerated there and that Defendant Bartos knew of this and failed to take steps "to ensure reasonable safety" in light of such risk. *See Farmer,* 511 U.S. at 844-845 (recognizing that where "prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep [but] instead...would...spend the night clinging to the bars nearest the guards' station...it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom."); *Collins,* 390 F.Supp. 2d. 964, 974 (granting summary judgment in favor of prison officials where there was no evidence that defendant prison officials "heard threats or saw attacks" that occurred between certain groups of prisoners or that the defendants were in a position to stop the transfer of the plaintiff to that unit). On the instant record, Plaintiffs have not pointed to probative evidence that would create a genuine question for trial as to whether Defendant Bartos knew of and disregarded a substantial risk of harm to Mr. Logan. Plaintiffs have failed to carry their burden as opponents to a motion

for summary judgment.   The fact that Mr. Logan was injured does not change this conclusion.  *See e.g. Farmer,* 511 U.S. at 844 (prison officials may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted).

B.  Plaintiffs' allegations regarding medical treatment

Under the Eight Amendment, prison officials have "an obligation to provide medical care for [prisoners]."  *Estelle v. Gamble,* 429 U.S. 97, 104 (1979).  A violation of the Eighth Amendment occurs when prison officials are deliberately indifferent to a prisoner's serious medical needs.  *Toguchi,* 391 F.3d at 1057 (*citing McGuckin v. Smith,* 974 F.2d 1050, 1059 (9th Cir. 1992) *overruled on other grounds, WMX Technologies, Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997)).

Deliberate indifference involves the "unnecessary and wanton infliction of pain," *Estelle,* 429 U.S. at 104. "Such indifference...may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *McGuckin,* 974 F.2d at 1059 (citation omitted) However, mere negligence in diagnosing or treating a medical condition without more, does not result in a violation of a prisoner's Eighth Amendment rights.  *Id.; Toguchi,* 391 F.3d at 1057.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *McGuckin,* 974 F.2d at 1059 (*quoting Estelle,* 429 U.S. at 106). When the claim involves a delay in treatment, "a prisoner can make 'no claim for deliberate medical indifference unless the denial was harmful...However, a finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary."  *Id.* at 1060 *(quoting Shapley v. Nevada Board of State Prison Comm'rs,* 766 F.2d 404, 497 (9th Cir. 1985); *Wood v. Housewright,* 900 F.2d 1332, 1339-40 (9th Cir. 1990)).  The Ninth Circuit has also recognized that "the fact that an individual sat idly by as another human being was seriously injured

- 12 -

despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering."  *Id.*

> 1.  Transport to St. Mary's Hospital

Mr. Logan testified at his deposition that during the ambulance ride from ASPC-Douglas to SEAMC, the paramedic who rode with him mentioned that "they had an AirEvac waiting for me, that I'm just going into the clinic for a couple minutes and they were going to put me on an AirEvac and send me to the trauma center in Tucson." (DSOF, Ex. A, p. 33) When Mr. Logan arrived at SEAMC, he "saw the helicopter sitting there with the rotors turning and I go into the clinic, get a CAT scan.  I come back out and, at that time, I'm told that not only am I not getting the AirEvac, I don't even get an ambulance.  I'm going to be put into the back of the [A]DOC van with two officers that...I can only assume have no medical training."  (Id. at p. 35) When he was leaving SEAMC for St. Mary's Hospital, Mr. Logan heard "somebody...arguing with the correction officers that were there and I heard against medical advice.  I believe it was the paramedic arguing at some point, he has to sign off...release me to the care of whoever and I'm his responsibility until that time...I'm not even sure it was him. I think it was him."  (Id. at p. 33) Mr. Logan did not remember anything further about the argument that he overheard nor did he recall hearing the mention of any names. (Id. at p. 34)  When Mr. Logan returned to ADOC after treatment for his injuries, an officer, whom he could not identify, told him that "it was a deputy warden that cancelled the AirEvac."  (Id. at p. 34)

Defendant Bartos' affidavit, submitted in support of his Motion, indicates that he has no authority to question or modify medical decisions absent a clear conflict with ADOC security considerations. (DSOF, Ex. C, ¶10) Defendant Bartos has "no recollection of having any involvement in the decision(s) regarding the means by which inmate Logan would be transferred from SEAMC to a hospital in Tucson following his assault; for that matter, I cannot recall ever having become involved in any decision as to how to transport an inmate to a medical facility."  (Id. at ¶11) Defendant Bartos further stated that an inmate with Mr.

Logan's security level can be transported to a hospital by ADOC van, ambulance or air-evacuation helicopter.  (Id. at ¶12)

"Liability under section 1983 arises only upon a showing of personal participation by the defendant."  *Taylor,* 880 F.2d at 1045.  Plaintiffs have offered no evidence specifically linking Defendant Bartos to the decision concerning Mr. Logan's transportation to St. Mary's Hospital. Mr. Logan's mere hearsay-based speculation that Defendant Bartos cancelled the helicopter transport does not defeat summary judgment.  *See Toguchi,* 391 F.3d at 1058 (conclusory allegations unsupported by factual data will not defeat a motion for summary judgment); *Nelson v. Pima Cmty. Coll.,* 83 F.3d 1075, 1081-1082 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

### 2.  Health care for injuries resulting from the July 21, 2000 assault

Plaintiffs state that "[a]s a result of the July 21, 2000 assault, Plaintiff Mr. Logan suffered severe injuries that required medical follow-up.  Plaintiff Michael Logan received no medication or treatment relative to his injuries until he filed an inmate grievance on August 11, 2000.  Defendant does not deny that Plaintiff Michael Logan received no medical treatment from July 21, 2000 until August 11, 2000. [sic]  Rather, Defendant claims that he was unaware of Plaintiff Mr. Logan's medical needs...." (Plaintiffs' Response to Defendant's Motion for Summary Judgment, pp, 5-6) Plaintiffs also allege that Defendant Bartos failed to implement procedures regarding provision of medical care.  (Complaint, p. 7)

Plaintiffs' allegation that Mr. Logan did not receive medical care since July 21, 2000 is not supported by the record.  Mr. Logan's deposition testimony reflects that he was taken to SEAMC and St. Mary's Hospital immediately after the July 21, 2000 assault and Plaintiffs have submitted medical records dating from July 21, 2000 through July 24, 2000 from such facilities as well as from ASPC-Douglas.  (*See* PSOF Ex. B; PSOF. Ex. A pp. 31-35) Defendant Bartos has also submitted medical records reflecting treatment dating from July 21, 2000 through August 21, 2000.  (DSSOF, Ex.A.1)  Records regarding medical care

- 14 -

provided to Plaintiff from July 21, 2000 until his return to ASPC-Douglas on July 22, 2000 are discussed *supra* at pp.3-5.

Records pertaining to Mr. Logan's medical care upon his July 22, 2000 return to ASPC-Douglas reflect the following: at 1025 hours on July 22, 2000, Correctional Registered Nurse McKinnon at ASPC-Douglas noted that she received a telephone call from St. Mary's Hospital regarding Mr. Logan's status.  (DSSOF, Ex. A.1, p.20)  At 1325 hours that same day, Mr. Logan arrived at ASPC-Douglas by ADOC car.  (Id.)  He stated that he felt "'O.K."; he was alert and oriented; and thought he could eat regular food instead of soft food.  (Id.)  Nurse McKinnon cleared Mr. Logan for placement in CDU.

At 1145 hours on July 23, 2000, Correctional Registered Nurse Heller saw Mr. Logan in CDU.  (Id.)  In response to Mr. Logan's request for ice, she reviewed his chart and beginning at 1230 hours, she ordered medical ice for 48 hours.  (Id.)

On July 24, 2000, Mr. Logan was examined by Dr. Poblanco.  (Id. at p.19)  Dr. Poblanco noted that Mr. Logan had facial swelling, a superficial laceration, and was neurologically intact.  He prescribed Ibuprofen 400 mg three times daily as needed for seven days, a regular diet as requested by Mr. Logan, and ice as needed.  (Id.)

On August 4, 2000, Mr. Logan submitted two Health Needs Requests (hereinafter "HNR"). One request was for consultation with a "licensed health care professional" regarding the nature and extent of his injuries, the treatment he might receive, and prognosis for recovery.  (Id. at p.65)  On August 5, 2000 this request was referred to nursing. (Id.)

Medical records for August 5, 2000, also show that Mr. Logan's mother called at 1120 hours regarding her son's health and Nurse Heller advised her to contact J. Clenney, Facility Health Administrator.  (Id. at p.17)  Additionally, at 1200 hours Nurse Heller performed a visual health and welfare check of Mr. Logan by viewing him through the food trap door in his cell.  (Id.)

On August 6, 2000, Correctional Registered Nurse Taylor saw Mr. Logan in response to his August 4, 2000 HNR.  (Id. at p.65)  She examined him, assessed alteration in comfort

due to post insult to face, and referred his "chart to provider for eval. of I/M [inmate] c/o Monday a.m. 8/7/00." (Id. at p.18)

The second HNR submitted on August 4, 2000, requested examination by a dentist and/or an oral surgeon and to be advised of the nature and extent of his injuries and recommended treatment. (Id. at p.64) On August 5, 2000, this request was referred to ASPC dental staff and on August 9, 2000 an appointment was made. (Id.) On August 10, 2000, Dr. McDougal, a dentist, performed a dental examination and took panorex x-rays which showed no observable mandibular, maxillary or zygoma fractures. (Id. at p.4) Dr. McDougal recommended that Mr. Logan request a complete dental exam in order to be advised as to his dental needs. (Id.)

On August 11, 2000, Mr. Logan submitted a HNR for a complete dental examination and repair of his "broken incisor, lost or damaged filling, and any other problems." (Id. at p.62) On August 12, 2000, the request was forwarded to the dental clinic and on August 14, 2000 an appointment was scheduled. (Id.) Mr. Logan saw Dr. McDougal again on August 31, 2000, and September 28, 2000. (Id. at p.4)

Also on August 11, 2000, Mr. Logan submitted a HNR in which he complained of episodes of acute pain primarily in his left temple area but occasionally on the right side as well. (Id. at p.63) He asked to see a physician about this. (Id.) In response to his HNR, on August 12, 2000, Mr. Logan was scheduled to see a nurse on August 17, 2000. (Id.) On August 21, 2000, he saw Dr. Poblanco. (Id. at p.17) Mr. Logan refused analgesics. (Id.)

Mr. Logan testified that after his July 22, 2000 return from St. Mary's Hospital:

> I was...basically just left to my own devices. I believe my injuries were sufficient that some follow up should have been automatic and when it wasn't automatic, I started asking for it. When I started asking for it, nothing was forthcoming. It took me a month to get in to see a doctor. It took me three weeks just to get some sort of response from the medical department. Mr. Bartos is the administrative head of all of these areas as I know them, which is why I feel he's the proper defendant, but I can't speak to that knowing that I'm completely accurate because I don't.

(DSOF, Ex. A, pp. 58-59)

- 16 -

Plaintiffs submit affidavits from Mrs. Nicole Logan and Mr. Logan's mother, Ms. Kathy Seltzer, indicating that sometime between July 21, 2000 and August 30, 2000 they each spoke to Defendant Bartos by telephone about ADOC's failure to provide necessary medical "attention" to Mr. Logan following his return from St. Mary's Hospital. (PSOF, Ex. E, G) Between July 21, 2000 and August 30, 2000, Ms. Seltzer "[p]rimarily and most often communicated with Mr. J. Clenney, the Facility Health Administrator ... at ASPC-Douglas." (PSOF, Ex. G) Additionally, medical records reflect that on August 5, 2000, Mr. Logan's mother spoke with Nurse Heller who referred her to the Facilities Health Administrator and who performed a visual health and welfare check on Mr. Logan about 40 minutes after speaking to Ms. Seltzer. (DSSOF Ex. A.1, p.17)

Defendant Bartos does not "specifically recall receiving calls from [Mr.] Logan's wife or mother inquiring about his medical status after his assault; if I had, without access to his medical records, I would most likely have referred them to the ASPC-Douglas Facility Health Administrator to provide whatever information was available at the time." (DSOF, Ex. C,¶17) According to Defendant Bartos, he would not have access to an inmate's medical records or specific medical requests unless the inmate "brings them to my attention, which is typically, and pursuant to...policy, done by way of an inmate letter or grievance appeal." (Id. at ¶15)  Defendant Bartos points out that Mr. Logan never filed a formal grievance regarding the assaults or medical care, therefore, "I would not have been made aware of any complaints he may have had about either."  (Id. at ¶16)

Plaintiffs have not maintained that the medical care Mr. Logan received at ADOC, SEAMC, or St. Mary's Hospital prior to Mr. Logan's July 22, 2000 return violated Mr. Logan's constitutional rights and the evidence does not support such a conclusion.  Further, the fact that Mrs. Logan and Ms. Seltzer may have spoken directly to Defendant Bartos concerning their perception that Mr. Logan had been refused medical attention after his July 22, 2000 return to ADOC does not create a genuine issue of material fact for trial given that the record herein reflects that Mr. Logan in fact received attention and treatment from ADOC

medical staff. Such treatment was consistent with Dr. Falk's discharge orders and included multiple contacts with registered nurses and a visit with Dr. Poblanco as early as July 24, 2000. The record also reflects that ADOC staff were responsive to Mr. Logan's HNRs. That Plaintiffs were not satisfied with the treatment received does not in and of itself establish a constitutional violation. Plaintiffs' bare allegation of constitutionally deficient medical treatment without factual support does not create an issue of material fact for trial. *See e.g. Toguchi,* 391 F.3d at 1058; *Nelson,* 83 F.3d at 1081-1082.

    C. Mr. Logan's placement in CDU

    Plaintiffs allege that Mr. Logan was placed in CDU when he returned from the hospital to ASPC-Douglas and that he "was treated precisely in the same manner as those inmates who are placed in...CDU as a punitive measure." (Complaint, p.6) Plaintiffs' Response to Defendant's Motion for Summary Judgment does not address the issue of Mr. Logan's placement in CDU. However, in their Statement of Facts, Plaintiffs cite to Mr. Logan's deposition testimony about CDU as follows:

> [I]t's not even like being in prison as far as we know prison. You're stuck into a cell sometimes with a cellmate..., sometimes not, sometimes with two cellmates, and you're left there. You're just left there. They bring you food. If you're up to it, you can take a shower two or three times a week. If you're up to it, you can go outside into a fenced cage to get some fresh air for 30 minutes two or three times a week, but the other 23 and a half hours of the day is stuck in that tiny little room...Mr. Bartos is the administrative head of all these areas as I know them, which is why I feel he's the proper defendant...."

(DSOF, Ex. A, pp. 58-59)

    Plaintiffs' attempt to connect Defendant Bartos based upon his administrative position to Mr. Logan's placement in CDU is unavailing given that there is no respondeat superior liability under section 1983. *Taylor,* 880 F.3d at 1045. Because Plaintiffs have presented no evidence creating an issue of fact as to whether Defendant Bartos participated in or directed Mr. Logan's placement in CDU, Defendant Bartos is entitled to summary judgment. *See Id.*

## V.  RECOMMENDATION

For the foregoing reasons, Plaintiffs have failed to submit evidence creating a genuine issue of material fact for trial.  Therefore, the Magistrate Judge recommends that the District Court grant Defendant Bartos' Motion for Summary Judgment (Doc. No. 57)

Pursuant to 28 U.S.C. §636(B), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number: CV 02-360-TUC-RCC.

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

The Clerk of Court is directed to send a copy of this Report and Recommendation to the parties and/or their counsel.

DATED this 23rd day of May, 2006.

_____
Héctor C. Estrada
United States Magistrate Judge

- 19 -